UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil No. 3:18-cv-00028-GFVT |
| V. | ) ) ) | |
| MARTIN L. HATFIELD, *in his Official Capacity as the County Attorney of Pulaski County, Kentucky*, et al., | ) ) ) ) | **OPINION** **&** **ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on two separate motions. First, both the Pulaski County and McCreary County Defendants move for reconsideration of this Court's March 26, 2019 Order, which denied Defendants' Motion to Dismiss. [R. 32; R. 34.] In a subsequent motion, Plaintiff Association of American Railroads moves for Partial Judgment on the Pleadings. [R. 39.] These motions concern two separate issues, one procedural and one substantive: (1) whether AAR has standing to pursue the requested relief, and (2) whether the two Kentucky statutes that are the focal point of this suit are federally preempted. Each issue will be taken in turn and, for the reasons that follow, the Defendants' Motions for Reconsideration are **DENIED** and Plaintiff's Motion for Partial Judgment on the Pleadings is **GRANTED**.

**I**

Defendants initially moved to dismiss this case on a number of different bases, including, as relevant here, the contention that AAR lacked associational standing. That contention was necessarily rejected when this Court denied Defendants' Motion to Dismiss in its entirety. [R. 31 at 3–5.] Both sets of Defendants now ask the Court to reconsider that specific issue based on

the recent Sixth Circuit ruling in *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250 (6th Cir. 2018). [R. 32; R. 34.] *Waskul*, however, does not have the effect that Defendants claim and this Court declines to reconsider the Motion to Dismiss as ruled upon in the prior Order.

This Court has the authority under Federal Rule of Civil Procedure 54(b)[1] and common law "to reconsider and modify interlocutory judgments any time before final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 952 (6th Cir. 2004) (citations omitted). The arguments that can be raised in a motion for reconsideration are limited. Generally, reconsideration is proper only in three circumstances: "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* at 959.

Here, Defendants request reconsideration under the first prong, pointing to what they believe is an intervening change of controlling law. Specifically, they claim the Sixth Circuit's ruling in *Waskul*, decided four days after they filed their reply brief in support of the Motion to Dismiss, effected a change in the controlling law concerning the first element of associational standing. [R. 32 at 2.] Most directly stated, Defendants claim that "*Waskul* reflects that prospective relief alone is insufficient to establish associational standing." [R. 37 at 2.]

As noted in this Court's prior Order, to establish associational standing all AAR must show is that: (1) one of its members would have standing to sue in its own right; (2) the relief it seeks is germane to its purpose; and (3) none of its members need to participate in their individual capacity. [R. 31 at 3 (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432

---

[1] The parties' briefing evidences a somewhat insignificant disagreement as to whether Federal Rule of Civil Procedure 59(e) or 54(b) provides the applicable standard in this context. [*See* R. 33 at 1.] Under either rule, a court may reconsider an earlier decision where there is an intervening change of controlling law. Ultimately, AAR is correct that Rule 54(b) controls as there has been no final judgment and this motion concerns an interlocutory order. *See* Fed. R. Civ. P. 54(b); *Russell v. GTE Gov't Sys. Corp.*, 141 Fed. App'x 429, 436 (6th Cir. 2005).

U.S. 333, 343 (1977)).] As to the first element of associational standing, an association must show one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Importantly, an association must abide by the general rule that "a plaintiff must demonstrate standing separately for each form of relief sought." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000) (citations omitted); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 498 (2009).

Applying these established principles of associational standing, this Court found that at least one member of AAR, Norfolk Southern Railway Company, would have standing to sue on its own accord if seeking an injunction. [R. 31 at 3–4.] As such, it was determined AAR properly established the first element of associational standing. *Id.* at 4. *Waskul* does nothing to change this analysis.

In *Waskul*, the association at issue sought to establish associational standing in order to pursue a "very discrete" form of injunctive relief on behalf of its members: the provision of certain notices and hearing rights. *Waskul*, 900 F.3d at 256. When the association brought suit seeking this injunctive relief, it did so on behalf of three named plaintiffs, along with certain unnamed plaintiffs. *Id.* at 254. Importantly, during the pendency of the federal lawsuit, the three *named* members of the association received the requested administrative relief in the form of favorable decisions from a state administrative law judge. *Id.* The association, however, pressed on and claimed associational standing on behalf of its unnamed members to pursue the requested injunctive relief which its three named members had already received. *Id.* at 256. Relatedly, the association contended that it sufficiently established associational standing to pursue a separate form of relief on behalf of its members—a due process claim. *Id.* at 255.

3

The *Waskul* court focused specifically on whether associational standing remained as to the requested injunctive relief. *Id.* at 256; *see also Friends of the Earth, Inc.* 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Because the named members had already received the requested relief in the form of favorable decisions, the Court held the association lacked associational standing going forward as to the requested injunctive relief. *Waskul*, 900 F.3d at 256–57. Specifically, the Court stressed the importance of establishing standing for each form of relief sought, stating: "In sum, even assuming at least one named member (and thus the Association) has standing to advance a due process *claim*, the requested injunctive relief on this interlocutory appeal simply would not have provided redress to any named member for any actual or imminent injury . . .." *Id.* at 257 (citations omitted) (emphasis in original).

AAR is therefore correct in stating that "*Waskul* . . . stands for two uncontroversial points: Standing is evaluated for each claim and form of relief sought, . . . and an association lacks standing to seek relief that would not redress any injury suffered by a named member[.]" [R. 33 at 3.] Here, Norfolk Southern has not received any relief resembling that received by the named members in *Waskul*, and, instead, the specter of future criminal liability remains. [*See* R. 31 at 4.] *Waskul* does not constitute an intervening change of controlling law and this Court's findings as to associational standing will remain undisturbed.

## II

The Court now turns to the substantive issue at hand: whether the two Kentucky statutes that are the focal point of this suit, KRS § 277.200 and KRS § 525.140, are federally preempted. These two statutes serve as the basis for enforcement actions by local Kentucky officials against AAR's named member, Norfolk Southern, for blocking grade crossings with public roads. Now,

4

AAR, pursuant to the Supremacy Clause, seeks a ruling that these statutes are expressly preempted by federal law in the form of the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101, *et seq*.  As the state statutes at issue relate to railroad safety and neither of the FRSA savings clauses apply, the Court finds that both statutes are expressly preempted by federal law, and AAR, on behalf of its members, is entitled to the requested relief.

A

Beginning in March 2017 and March 2018, respectively, the Pulaski County and McCreary County Sheriff's Offices issued numerous citations to Norfolk Southern Railway Company, an AAR member, for obstructing a highway.  [R. 1 at 11–12; R. 41-1.]  These citations were issued pursuant to KRS § 277.200 and KRS § 525.140, as a result of Norfolk Southern trains blocking grade crossings for prolonged periods of time.  [*See e.g.,* R. 41 at 2–3.][2]  Both the Pulaski County Attorney and McCreary County Attorney enforced the respective citations, pursuing fines in state court.  [R. 1 at 11–12; R. 40 at 2; R. 41 at 2–3.]

Following the enforcement actions against Norfolk Southern, Plaintiff AAR brought the present case in a representational capacity, seeking a declaration that both of the "anti-blocking" state statutes are preempted by federal statutes, as well as seeking permanent injunctive relief against the state actors.  [R. 1 at 2–3.]  As noted above, the Defendants moved to dismiss the federal action on a number of bases and this Court denied that motion.  [R. 31.]  AAR now moves for partial judgment on the pleadings pursuant to Rule 12(c), arguing that, as a matter of law, the two Kentucky statutes are expressly preempted by the FRSA specifically and are therefore void and unenforceable under the Supremacy Clause.  [*See* R. 39.]

---

[2] The Pulaski County citations were issued only for violations of KRS § 277.200, whereas the McCreary County citations were issued for violations of both KRS §§ 277.200 and 525.140. [R 40 at 2; R. 41 at 3.]

5

**B**

"After the pleadings are closed . . . a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Despite the difference in timing, a motion for judgment on the pleadings requires courts to employ the same "standard of review employed for a motion to dismiss under Rule 12(b)(6)." *Florida Power Corp. v. FirstEnergy Corp.*, 810 F.3d 996, 999 (6th Cir. 2015) (citations omitted). As such, for purposes of such a motion, "all well-pleaded material allegations of the opposing party must be taken as true . . . ." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). While a court must accept as true all well-pleaded factual allegations, it need not accept legal conclusions as true. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citation omitted). If "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law," then a motion brought pursuant to Rule 12(c) is properly granted. *Tucker*, 539 F.3d at 549 (quoting *JPMorgan Chase Bank, N.A.*, 510 F.3d at 582).

The operative constitutional text in view of AAR's motion is the Supremacy Clause. The Supremacy Clause provides that, "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U.S. Const., Art. VI, cl. 2. If a state law "interferes with or is contrary to federal law," the state law must yield. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (citations omitted). Importantly, determining "whether federal law preempts state law turns principally on congressional intent." *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 948 (6th Cir. 2002) (citations omitted).

Under the Supremacy Clause, federal law can preempt state law in three separate ways: express preemption, field preemption, and conflict preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). Express preemption occurs where Congress explicitly defines the extent

to which its enactments preempt state law. *Id.* (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95–98 (1983)). As preemption is fundamentally a question of congressional intent, "when Congress has made its intent known through explicit statutory language, the court's task is an easy one." *Id.* The court's task in this context is to simply "focus on the plain wording of the [express preemption] clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993)). Here, Congress has included an express preemption clause within the FRSA and therefore the question is whether the state statutes are expressly preempted in light of this clause.

## C

### 1

The FRSA was enacted in 1970 to regulate railroad safety in a nationally uniform manner. 49 U.S.C. § 20101; *see also CSX Transp., Inc. v. Pub. Utilities Comm'n of Ohio*, 901 F.2d 497, 499 (6th Cir. 1990). In furtherance of the goal of national uniformity, Congress included the following express preemption clause:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>    (1) is necessary to eliminate or reduce an essentially local safety hazard;
>    (2) is not incompatible with a law, regulation, or order of the United States Government; and
>    (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106. The Sixth Circuit has summarized this provision as follows: "The FRSA therefore permits state regulation related to railroad safety only if: (1) the Secretary of Transportation has not yet regulated the subject matter of the state regulation (the first savings

7

clause), or (2) the regulation (a) is necessary to eliminate an essentially local hazard, (b) does not conflict with federal law, and (c) does not unreasonably burden interstate commerce (the second savings clause)." *CSX Transp., Inc. v. City of Plymouth*, 283 F.3d 812, 815 (6th Cir. 2002) *(Plymouth III)*; *see also id.* at 816 (citations omitted) (explaining that the "presumption against federal preemption is embodied in the saving clauses of 49 U.S.C. § 20106.").

## 2

As noted above, the two Kentucky statutes at issue are KRS §§ 277.200 and 525.140. KRS § 277.200 prohibits a railroad company from "obstructing any public highway or street . . . by stopping and permitting trains, engines or cars to stand upon a public grade crossing . . . for more than five (5) minutes at any one time," unless such a circumstance is beyond the control of the railroad. KRS § 525.140 prohibits anyone from "render[ing] any highway or public passage impassable without unreasonable inconvenience or hazard," which local Kentucky officials have interpreted to include trains blocking public grade crossings.

At a threshold level, to prevail on a claim that the FRSA preempts state law, a plaintiff must first show that the state laws at issue relate to railroad safety. *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001). Determining whether a state law relates to railroad safety requires analysis of the terms of the law and, crucially, "what the [law] requires in terms of compliance." *CSX Transp., Inc. v. City of Plymouth, Mich.*, 86 F.3d 626, 629 (6th Cir. 1996) *(Plymouth I)*. Moreover, "though a state regulation may have an alternative purpose and does not reference railroad safety, it may be related to railroad safety because it has a connection with railroad safety." *Tyrell*, 248 F.3d at 523 (internal citations and quotations omitted).

Here, it is clear KRS § 277.200 relates to railroad safety and, further, that, as applied, KRS § 525.140 also relates to railroad safety. As will be made clear below within the analysis as

8

to the first savings clause, compliance with the Kentucky statutes would likely require shorter or faster trains, or changes in how federally-mandated air brake tests are undertaken, and, thus, necessarily, the statutes relate to railroad safety. *See Plymouth I*, 86 F.3d at 629. While the McCreary Defendants maintain that further factual development is needed on the "actual effects of the[] citations upon the railway's business," [R. 41 at 4], such case-by-case analysis is improper and, instead, the focus is on the effect of the statutes themselves and what they require in terms of compliance.[3] *Plymouth I*, 86 F.3d at 629. Moreover, as a practical matter, both the Pulaski Defendants and McCreary Defendants effectively concede the threshold "relate to" issue, focusing their briefing on whether either savings clause applies. [*See, e.g.,* R. 40 ("The first issue is whether the state statutes fall within the first savings clause of the preemption analysis.")]. As such, more thorough analysis begins with the first savings clause of the FRSA express preemption provision.

## D

### 1

The first savings clause permits state regulation related to railroad safety where the Secretary of Transportation has not yet regulated the subject matter of the state regulation. *Plymouth III*, 283 F.3d at 815. With regard to this clause, the Supreme Court has held that preemption under the FRSA occurs "only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood,* 507 U.S. at 664. Notably, "in characterizing the subject matter of the state requirement, the Court must not turn a blind eye to

---

[3] Additionally, the Sixth Circuit and numerous state Supreme Courts have thoroughly analyzed substantially similar state anti-blocking laws and their "inevitable effects." The analysis in these cases is instructive and bears directly on the issue of what the present Kentucky statutes require in terms of compliance. *See, e.g.*, *Plymouth I*, 86 F.3d 626 (6th Cir. 1996); *Plymouth III*, 283 F.3d 812 (6th Cir. 2002); *Krentz v. Consol. Rail Corp.*, 589 Pa. 576 (Pa. 2006); *Vill. of Mundelein v. Wisconsin Cent. R.R.*, 882 N.E.2d 544, 552 (2008).

9

the statute's effect on the railroad." *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 652 (E.D. Mich. 2000) (*Plymouth II*), *aff'd*, 283 F.3d 812 (6th Cir. 2002)

The Sixth Circuit's recent opinion in *Plymouth III*, 283 F.3d at 816, where the Court analyzed whether a similar Michigan statute was preempted by the FRSA, offers direct guidance as to the first savings clause inquiry. There, similarly, the Court stipulated that the subject matter of the state statute was "the time that trains may block highway traffic." *Id.* at 816. This established, the Sixth Circuit agreed with the district court's finding that the Secretary of Transportation had promulgated regulations that substantially subsumed the same subject matter, including the following: 49 C.F.R. §§ 213.9 and 213.307 (maximum speed limits for different classes of track); § 213.57 (maximum speed limits for different curves); Pt. 232.12–13 App. B (air brake testing). *See id.* at 816; *see also Vill. of Mundelein*, 882 N.E.2d at 553 ("Taken together, the overall structure of these regulations substantially subsumes the subject matter of the movement of trains at grade crossings."). The Sixth Circuit explained that "because the amount of time a moving train spends at a grade crossing is mathematically a function of the length of the train and the speed at which the train is traveling," the effect of the state statute would be to require the railroad to "modify either the speed at which its trains travel or their length, and would also restrict [its] performance of federally mandated air brake tests." *Id.* at 817. Thus, the Court held first savings clause of the FRSA did not apply to the Michigan statute at issue. *Id.*

a

The Pulaski Defendants dispute the applicability of the Sixth Circuit's first savings clause analysis in *Plymouth III* as it relates to KRS § 277.200 in particular. Specifically, they argue that, contrary to the Michigan statute, "KRS [§] 277.200 does not deal with moving trains, but with

10

parked or stopped trains." [R. 40 at 6.] Thus, the argument continues, the "Kentucky statute is not a mathematical function of train speed and length because it deals with trains at rest, not in motion, by preventing 'stopping' and 'stand[ing]' on train tracks." *Id.* (alteration in original).

Defendants' line of argument zeroes in on an ultimately insignificant distinction and ignores the "inevitable effect" of KRS § 277.200 on how railroad companies must operate in Kentucky. *Plymouth III*, 283 F.3d at 816. Logically, train length and the performance of federally mandated air brake tests are still impacted by a time restriction concerning how long a parked train can spend at a railroad crossing. *Id.* at 817 ("There are . . . numerous federal regulations that cover the speed at which trains may travel and the stops that trains must make to test their air brakes."). Consideration of case law on the issue further supports the conclusion that the stopped-versus-moving distinction carries little weight.

As it specifically relates to potential conflict of state law with federally-mandated air brake testing, the Pennsylvania Supreme Court's analysis in *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 602 (2006) is instructive. There, the Court analyzed a Pennsylvania statute that similarly prohibited railroads from blocking grade crossings for "an unreasonable length of time." 589 Pa. at 602–03. First, the Court noted that "[t]he FRSA regulations requiring and specifying the inspection and testing of brake systems direct railroads to alter train movement" and, in fact, "direct trains to remain stationary[.]" *Id.* at 601–02. Thus, the Court held that the FRSA air brake regulations covered the same subject matter of the state law, which, like KRS § 277.200, directed trains to "keep moving." *Id.* at 601. Based in part on this straightforward analysis, the Court ultimately held that the FRSA expressly preempted the conflicting state law. *Id.* at 603.

11

In support of the reasoning in *Krentz*, it is important to note that "nothing in the plain language of the [federal] regulations indicates that [the railroad] has the discretion to move the train before conducting the air brake tests." *Plymouth II*, 92 F. Supp. 2d at 656, *aff'd*, 283 F.3d 812 (6th Cir. 2002). Furthermore, even if a railroad did have discretion to move the trains past a particular intersection before air brake testing occurs, "Defendants fail to suggest where [a railroad] could perform the tests without blocking other intersections." *Id.*

Defendants' attempts to distinguish the inevitable effects of KRS § 277.200 from those of other previously invalidated statutes are unavailing. The requirements of the statute have "the inevitable effect of regulating a train's speed, length, and performance of air brake testing" and, therefore, the first savings clause of the FRSA is inapplicable. *See Plymouth III*, 283 F.3d at 816.

**b**

Similarly, although the applicability of the first savings clause to KRS § 525.140 is the subject of limited briefing by the parties, it is clear that, as applied, it requires similar compliance measures and, thus, presents identical concerns. The statute prohibits anyone from "render[ing] any highway or public passage impassable without unreasonable inconvenience or hazard." KRS § 525.140. In effect, it prohibits the same activity as KRS § 277.200 when applied to railroad companies and thus, when viewed in light of the above analysis, it too "has the inevitable effect of regulating a train's speed, length, and performance of air brake testing." *Plymouth III*, 283 F.3d at 816. Indeed, two of the citations issued by the McCreary County Sheriff reference both statutes as the basis for the alleged unlawfulness of Norfolk's conduct. [R. 41 at 3.]

Numerous federal regulations substantially subsume the subject matter of KRS §§ 277.200 and 525.140. Consequently, the first savings clause of the FRSA is inapplicable to save either statute from express preemption.

**2**

The conclusion that the second savings clause does not apply to either Kentucky statute is similarly clear. Under this clause, a state law related to railroad safety is permitted if it: (a) is necessary to eliminate an essentially local hazard, (b) does not conflict with federal law, and (c) does not unreasonably burden interstate commerce. *Plymouth III*, 283 F.3d at 815. For this savings clause to apply, all three requirements must be met. As the Kentucky statutes are statewide in application, they do not meet the "essentially local hazard" requirement and, thus, the second savings clause does not apply. *Id.* at 816 ("[B]ecause the [state] law is applicable to the entire state, the statute is not concerned with "eliminat[ing] an essentially local hazard.").

It is not disputed that KRS §§ 277.200 and 525.140 are rules of statewide application. Instead, Defendants argue that a rule of statewide application can eliminate a local hazard within the meaning of the second savings clause and therefore this savings clause can apply to the prevent preemption of KRS §§ 277.200 and 525.140. In making this argument, Defendants promote an interpretation of the FRSA which would be contrary to the interpretation of every federal court of appeal which has visited the issue to this point.

The Eight Circuit, faced with the same issue, explained the uniform definition adopted by other courts of appeal to that point: "The courts of appeal which have addressed the issue have defined essentially local safety hazards as 'local situations which are not statewide in character and not capable of being adequately encompassed within national uniform standards.'" *Duluth, Winnipeg & Pac. Ry. Co. v. City of Orr*, 529 F.3d 794, 798 (8th Cir. 2008) (citations omitted) (citing *Norfolk & W. Ry. v. Publ. Utils. Comm'n,* 926 F.2d 567, 571 (6th Cir. 1991). Further, after thorough review of the legislative history, the Eight Circuit explained that a state statute would be upheld under the second savings clause only if "at least one of the conditions allegedly

13

contributing to an essentially local safety hazard was unique to the locale." *Duluth*, 529 F.3d at 798 (citing H.R. Rep. No. 91–1194, at 11 (1970), reprinted at 1970 U.S.C.C.A.N. 4104, 4117). The Sixth Circuit has adopted a nearly identical interpretation. *Norfolk & W. Ry.*, 926 F.2d at 571–72.

Defendants fail entirely to show how KRS §§ 277.200 and 525.140 address any "essentially local safety hazard[s]." *Id.* at 816. In fact, Defendants argue such a local purpose is not necessary and instead put forth the tenuous argument that "when considering the nations [sic] entire railroad system, the laws of Kentucky would be local." [R. 41 at 11.] Based upon the case law in this circuit and others, in addition to the legislative history, this interpretation of the second savings clause must be rejected.

Given the clear statewide application of KRS §§ 277.200 and 525.140, it is unnecessary to proceed past the first prong of the second savings clause analysis. The second savings clause is also inapplicable. Therefore, as KRS §§ 277.200 and 525.140 relate to railroad safety and neither of the FRSA savings clauses apply, the Court finds that both statutes are expressly preempted by federal law under the Supremacy Clause. KRS § 277.200 is facially preempted and KRS § 525.140 is preempted as applied to trains blocking public grade crossings.

### III

The Court has resolved Plaintiff's claims that the Kentucky statutes at issue are preempted by the FRSA. As this holding is completely dispositive of this action, a determination of the remaining claims is unnecessary. Accordingly, the next and final issue concerns the relief to which Plaintiff AAR is entitled. Based upon the considerations set forth below, Plaintiff AAR is entitled to permanent injunctive relief.

Two legal standards must be considered in determining the nature of relief available to AAR. The first relates to this Court's authority to grant the requested relief. As noted in this Court's prior Order in this case, "it is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." [4] [R. 31 at 3 (quoting *Shaw*, 463 U.S. at 96 n. 14).] More specifically, federal courts may properly enjoin state officers where they "threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." *Ex parte Young,* 209 U.S. 123, 156 (1908); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding that injunctive relief was properly available where a preempted state law allowed state officials to impose monetary liability "through suits under their respective state laws"). Here, the named member of AAR, Norfolk Southern, is currently the subject of ongoing criminal enforcement actions pursuant to the two federally preempted, and therefore unconstitutional, Kentucky statutes. As such, the state officers may properly be the subject of injunctive relief.

The second standard concerns whether the requested relief is appropriate in the present factual context. In considering whether to grant permanent injunctive relief, a court must consider four factors: (1) actual success on the merits, (2) whether failure to grant the injunction will result in irreparable injury, (3) whether issuance of the injunction would cause substantial harm to the opposing parties, and (4) whether the injunction will not disserve the public interest. *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012); *see also VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).

---

[4] The present statute, the FRSA, does not act to remove this jurisdiction. *See, e.g., Plymouth I*, 86 F.3d 626 (affirming the district court's grant of a permanent injunction where state law was preempted by the FRSA).

As to the first factor, Plaintiff has shown actual success on the merits pursuant to the Court's finding that the Kentucky statutes are preempted by federal law and therefore unconstitutional. Second, as Plaintiff's named member remains the subject of numerous state enforcement actions pursuant to the preempted statutes, there is the clear potential for irreparable injury if the injunction is not granted. Third, the Defendants have not provided the Court with any example of harm they will suffer if the injunction is granted and the Court is aware of none.

Finally, as to the fourth factor, the injunction's impact as it regards the public interest is unclear. It might be argued that it disserves the public interest when railroad crossings are blocked for extended amounts of time. However, such a consideration is not within the purview of this Court. Ostensibly, Congress passed the FRSA believing its provisions and attendant regulatory scheme served the public interest, specifically as it concerns the interest of national uniformity for railroad safety. *Testa v. Katt*, 330 U.S. 386, 392 (1947) ("When Congress, in the exertion of the power confided to it by the Constitution, adopted [an] act, it spoke for all the people and all the states, and thereby established a policy for all."). Consistent with the findings of this Order, the Defendants are permanently enjoined from enforcing KRS § 277.200 and KRS § 525.140.

## IV

The Court acknowledges the state's historical role in the regulation of its local highways. However, the Kentucky statutes at issue have the effect of directly regulating railroads, whether by affecting the length of their trains, the performance of their federally-mandated air brake tests, or otherwise. In light of the Congressional policies underlying the FRSA, the state does not have the authority to regulate highway safety to the extent that its laws require the railroad to effect such substantial changes. While the Court understands the frustrations of motorists and local law enforcement stemming from extended delays at railroad crossings, the type of limitations

16

included in KRS §§ 277.200 and 525.140 must come from the federal government.  Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Pulaski County Defendants' Motion for Reconsideration [**R. 32**] is **DENIED**;

2. The McCreary County Defendants' Motion for Reconsideration [**R. 34**] is **DENIED**;

3. Plaintiff Association of American Railroad's Motion for Partial Judgment on the Pleadings [**R. 39**] is **GRANTED**, consistent with the findings of this Order;

4. The Defendants and their officers, attorneys, and agents are permanently enjoined from enforcing KRS § 277.200;

5. The Defendants and their officers, attorneys, and agents are permanently enjoined from enforcing KRS § 525.140 as against railroad companies for blocking public grade crossings;

6. McCreary Defendants' Proposed Agreed Order to Substitute Parties [**R. 42**] is **GRANTED**; and

7. This case is **STRICKEN** from the Court's active docket.

This the 28th day of January, 2020.

Gregory F. Van Tatenhove
United States District Judge